UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 09-91(1) (DWF) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Charles E. Hays, Jr., a/k/a Chuck Hays, | |
| Defendant. | |

Ann M. Anaya, James S. Alexander, and Laura Perkins, Assistant United States Attorneys, United States Attorney's Office, counsel for Plaintiff.

Thomas E. Bauer, Esq., Thomas Bauer and Associates, counsel for Defendant.

Brooks F. Poley, Esq., Winthrop & Weinstine, PA, counsel for Claimants G. Dennis Bingham and Irene Rafferty.

Casey T. Rundquist, Esq., Piper L. Kenney, Esq., and William J. Mauzy, Esq., Law Offices of William J. Mauzy, counsel for Claimant Jean Ann Smith.

Andrea G. White, Assistant County Attorney, Dakota County Attorney's Office, counsel for Claimant County of Dakota.

Bradley T. Smith, Esq., and J. David Jackson, Esq., Dorsey & Whitney LLP, counsel for Movant Bruce Hendry.

## INTRODUCTION

This matter is before the Court on Bruce Hendry's ("Mr. Hendry") motion pursuant to the Crime Victims Rights Act, 18 U.S.C. § 3771(d)(3) ("CVRA"), for leave to

submit a proposed plan for distribution of restitution funds (Doc. No. 101) and to stay distribution of funds pending the Court's consideration of that plan (Doc. No. 102). The Court, over the objection of the United States, set the matter for hearing on August 3, 2011. The United States opposes the motion, asserting that Mr. Hendry's motion seeks to reopen sentencing to permit him to present an alternative restitution plan that the United States alleges is barred by 18 U.S.C. § 3771(d)(5). Moreover, the United States asserts that Mr. Hendry has had more than a reasonable opportunity to exercise his rights under the CVRA and, in fact, has already presented his proposed restitution plan to the Court.

For the reasons set forth below, the Court denies Mr. Hendry's motions and orders that the restitution be distributed proportionately as it is collected, as originally intended by the Court, namely, on a pro rata basis as described below.

## BACKGROUND

In February 2009, the United States filed a criminal complaint against Charles E. Hays, Jr. ("Defendant"). In April 2009, the United States filed a criminal information against Defendant, charging him with three counts related to transactions with Crossfire Trading, LLC[1] ("Crossfire"), a day-trading business: (1) mail fraud in violation of

---

[1] Crossfire Trading LLC is a domestic limited liability company incorporated in Minnesota on March 27, 2006. Defendant was the President of Crossfire and operated Crossfire out of his residence. Statement of the Offense ¶ 2.

2

18 U.S.C. § 1341; (2) wire fraud in violation of 18 U.S.C. § 1343; and (3) structuring in violation of 31 U.S.C. § 5324(a)(3) and (d)(2).

On April 14, 2009, Defendant pled guilty to Counts 1 through 3 of the Information. (Doc. No. 29.) As part of the Plea Agreement, the Defendant agreed that the separately filed "Statement of the Offense" (Doc. No. 27) fairly and accurately described Defendant's actions and involvement in the charged offenses. Specifically, the Defendant agreed that from on or about January 2001 through on or about February 2009 he devised and participated in a scheme whereby he solicited individuals to invest money with him and/or Crossfire. Defendant held himself out to be a day trader in stock index futures and other futures contracts. However, he falsely represented to investors that his trading was consistently profitable and earned approximately 3 percent per month. Many investors chose to invest with Defendant based on these fraudulent statements. Defendant provided investors with a document entitled "Investment Agreement Between [Customer Name] and Crossfire Trading L.L.C." that misrepresented the goals and activities of Crossfire and how investor profits and losses would be handled. According to the agreement, Crossfire is a "day-trading company whose primary activity is short term (intra-day) trading of futures. The trading activities are limited to registered equities traded on the CME, CBOE and NYMEX." However, rather than use the investor funds to trade any equities listed in the investor agreement, Defendant diverted and converted certain funds obtained from investors for his own personal use and benefit. In so doing, he created and sent investors fraudulent monthly "Crossfire Investor Summaries"

purportedly showing their investments and any gains on the investments. Oftentimes, in order to give legitimacy to his fraudulent activities, Defendant would use funds received from new investors to make payments to earlier investors.

There is no dispute that Defendant engaged in what is commonly called a Ponzi-type operation or scheme. One of the key characteristics of a Ponzi scheme is that not all of the assets are immediately consumed by the perpetrator of the scheme–in this case, Defendant. Moreover, the classic Ponzi scheme is most often a fraudulent investment scheme in which the earlier investor's returns are generated by the influx of fresh capital from unsuspecting new investors, rather than through legitimate investment activity. *Cunningham v. Brown*, 265 U.S. 1, 44 S. Ct. 424 (1924) (describing the scheme of Charles Ponzi).

Defendant was sentenced on April 27, 2010, to 117 months imprisonment and ordered to pay criminal restitution in the amount of $21,601,065.87.[2] The Court filed its criminal judgment on May 6, 2010. (Doc. No. 72.)

The Court is somewhat perplexed about Mr. Hendry's assertions that he has not had input pursuant to the CVRA into the issue of restitution as a victim. The record confirms Mr. Hendry's input consistent with the CVRA. Moreover, the record and procedural history in this case explains, at least in substantial part, why the United States asserts that Mr. Hendry's request is untimely and therefore barred from consideration by

---

[2] That figure is now $21,650,065.87 because of a mathematical computation that adds $49,000 to the original figure ordered for criminal restitution.

the Court, rather than addressing the merits of the pro rata distribution plan that was selected by the Court.[3]

As the Presentence Report confirms, a victim impact statement was mailed to all victims. The Court received and reviewed at least 84 responses. Mr. Hendry was provided more than ample notice of the criminal proceedings in this case, proof of which is that he has exercised those rights under the CVRA. *See* Government's exhibit containing notices sent to Mr. Hendry throughout the criminal proceedings which was attached to the Declaration of Alexandra McWhorter as Exhibit 1.

In fact, in addition to Mr. Hendry communicating with representatives of the United States Attorney's Office, the United States Probation and Pretrial Services Office, as well as the United States Clerk of Court's Office, Mr. Hendry directly communicated with the Court. Specifically, as early as July 16, 2009, in an e-mail communication to the Court, Mr. Hendry presented his "Ponzi Scheme Fairness Doctrine" to this Court. Mr. Hendry has been advocating that plan, with various modifications, including a

---

[3] The pro rata distribution plan ordered by the Court and confirmed in this Order is supported by the majority of the 115 victims who have corresponded with the Court. There were 18 victims who sustained no loss, as they received more money than they originally invested. As of the date of this Order, the United States has not sought to "claw back" $2,999,618 from the 18 victims who were admittedly overpaid. Whether an investor incurred a loss or, put another way, was a net loser, the Court compared the total amount the investor invested in the scheme with the total amount of payments, if any, the investor received over the lifetime of the investment. For example, if an investor invested a total of $100,000 and received a total of $20,000 in payments, the investor would be considered to have a net or actual loss in the amount of $80,000.

modification presented at the time of the last hearing in this matter on August 3, 2011, with an attached affidavit presented from David S. Abrams, who is a professor of law, business and public policy at the University of Pennsylvania. Admittedly, as Mr. Hendry's counsel explained at the hearing on August 3, 2011, the declaration provided to the Court, over the objection of the United States, does not fully describe the plan in detail. However, counsel appropriately went on to state that the description that is most appropriate for the plan is a "percentage equalization method of distribution," that is to say, a percentage based upon the total amount of loss determined by the percentage of loss to each of the victims. For example, if a victim was paid back 80 percent, they would have a 20 percent loss. Counsel for Mr. Hendry set forth the plan in summary form at the hearing. *See* T. 49-50. Mr. Hendry also addressed the Court, explaining his plan, which was substantially consistent with earlier correspondence the Court, the United States Attorney's Office, and the United States Probation and Pretrial Services Office had received describing his submissions, as noted above, as a "Ponzi Scheme Fairness Doctrine." *See* T. 59-63.

  Frankly, more so than in almost any other case the Court has been involved in over the years, victims in this case have communicated with the Court, the United States Attorney's Office, and the United States Probation and Pretrial Services Office, not just by submitting letters to the Court that are all part of the record, but also by being present in large numbers at hearings to give additional input by way of testimony. In sum, the Court has all of the information that it needs, quite apart from whether Mr. Hendry's

motion is timely or not, to rule on the merits of what is an equitable and fair distribution plan. The Court has the information it needs to sit as a "court of conscience." *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996).

## DISCUSSION

While the United States may be correct, for the reasons stated in their submissions, that the motion request filed by Mr. Hendry under the CVRA is untimely and therefore barred, the Court, without reaching that issue, will address the merits. The Court's decision is the same today now that it has reviewed Mr. Hendry's most recent proposed plan as it would have been, and was at the time of sentencing on April 27, 2010. In the Court's view, the interests of justice, the public interest, and the interests of all of the victims in this case, irrespective of whether they have had contact with the United States Probation and Pretrial Services Office, deserve a ruling from the Court on the merits, even though most victims oppose Mr. Hendry's plan.

Mr. Hendry has asserted that the judgment does not specify the method by which restitution is to be distributed. However, that is at least, in a technical sense, not the case, because the criminal judgment states, in pertinent part, as follows: "If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid." Judgment in a Criminal Case, Doc. No. 72.

The Court states "in a technical sense" because the transcript of the sentencing will indicate that there was little, if any, discussion about restitution except for a "claw back" issue of approximately $2.9 million and the Court's reference, without either party raising the issue, of a "proportionate payback" which is also known as pro rata distribution. That is not to say that there was not discussion in correspondence between Mr. Hendry and other victims with the United States Attorney's Office and the Court, as well as with the United States Probation and Pretrial Services Office, prior to the sentencing, but there was no discussion at the time of sentencing on the issue now before the Court. Consequently, the language used at page 5 of the criminal judgment was consistent with similarly-situated cases and oftentimes referred to as standard or boilerplate language, with no requested input from either the Defendant or the prosecution.

When the Court sits in equity, as contemplated by the applicable case law, the Court truly sits as a "court of conscience." *Durham*, 86 F.3d at 73. The Court has broad authority to decide and approve a plan of distribution, as long as it is done equitably and fairly, with similarly-situated victims being treated consistently, while also taking into account, as 18 U.S.C. § 3664(i) requires, not only the amount of each victim's net or actual loss, but the economic circumstances of each victim. Here, that requires this Court, if practical, to evaluate over a period of eight years the economic circumstances of at least 97 of the 115 victims.[4] Those economic circumstances, at any given point in time over

---

[4] *See* fn.3.

the course of eight years are unknown to the Court as well as the United States Probation and Pretrial Services Office.

The guiding principle that emerges from the applicable case law is that whatever distribution the Court implements, distribution should be equitable and fair. *Cunningham*, 265 U.S. at 13. Given the specific circumstances of this case, including the number of investors, the prolonged period of time over which the Ponzi scheme occurred, and absent a 100 percent claw back, the most equitable way in which to proceed is to use a pro rata basis distribution. As noted above, to conclude otherwise would require this Court to not only evaluate the economic circumstances of each victim, as required by 18 U.S.C. § 3664(i), but in performing that evaluation, the Court would have to fairly and equitably go back over a period of approximately eight years to examine those circumstances in addition to the actual loss each victim experienced. The Court has concluded that it would not be practical, fair, or equitable to do so for the reasons stated. The Court, therefore, respectfully declines to implement Mr. Hendry's proposed distribution plan.

Under Mr. Hendry's distribution plan, for example, if a victim was paid back 80 percent on their investment over the course of eight years, rather than receive a pro rata distribution based upon actual or net loss after any returns, he/she would be deemed to have a 20 percent loss and would not be paid back any portion of that loss until other victims in the case had received as close as possible a return on their investment of 80 percent from the proceeds available for restitution. This plan being described by

9

Mr. Hendry, as noted above, is the "Percentage Equalization Method of Distribution" or, in the words of Mr. Hendry himself in correspondence with the United States Attorney's Office, "therefore, to be fair, the later investors should not receive funds until they 'catch up' with the payments received by the earlier investors."[5] David S. Abrams describes it as a "modified last-in-first-out method of distribution." Or, as explained by Mr. Hendry's counsel at the August 3, 2011 hearing when counsel referred to it as a "percentage equalization method" of distribution:

> [I]f a victim was paid back 80 percent, they would have a 20 percent loss. If a victim was paid back zero dollars of their investment, they would have a 100 percent loss. . . . [Y]ou would take those people with the largest losses of a percentage. So, let's take somebody with 100 percent loss. And you would pay them back on a percentage basis until they reached the level of the next largest loss measured in terms of percentage. So, for example, if you are at 100 percent, the next largest loss is 90 percent. And then they would, in turn, people at the 90 percent level would in turn rise together until you reach the third level, and they in turn would rise up.

T. 49-50.

The Court acknowledges that Mr. Hendry has submitted this plan in good faith. There may be cases where this plan, depending upon the specific circumstances of the Ponzi scheme or the fraud, would be the most fair and equitable way in which to distribute proceeds when those proceeds fall short of the losses of the victims. However, on the present record. The Court stands by its decision to implement the pro rata distribution based upon the loss, as it exists today vis-a-vis the percentage of loss in

---

[5] January 6, 2011 letter from Bruce Hendry to Erika Mozangue, Assistant United States Attorney.

comparison to the other investors for the reasons stated.  Absent the Court being able to evaluate the circumstances of specific paybacks over the course of eight years, the Court declines to adopt Mr. Hendry's position and all of the later investors, because the Court has concluded that each investor was similarly victimized.  Consequently, given the specific circumstances before the Court, it is fair and equitable to view all of the investors/victims in equal terms and having all been victimized by the Defendant's fraud with the use of a Ponzi scheme.

The Court has concluded that a pro rata distribution plan is a fair and equitable method to distribute the funds to the investors who have fallen victim to this more than eight-year Ponzi scheme.  It is understandable that some investors, such as Mr. Hendry, more than others, will not view it as the most equitable way in which to proceed, for the reasons that he has stated.  However, an equitable plan, as many courts have observed, is not necessarily a plan that everyone will like.  As the Court has noted above, what is fair and equitable will depend on the unique circumstances of each case.  Consequently, courts have approved different types of plans in different situations.  There is a reason why the use of pro rata distribution has been deemed fair and equitable for fraud victims of a Ponzi scheme, especially in the circumstances like those before this Court. *Cunningham*, 86 F.3d at 13.  The fact that some of the earlier investors, through the fortuitous actions of the Defendant, were paid money from later investors, thereby reducing their loss, does not render the pro rata distribution inequitable, especially when they only recover under the pro rata distribution method based upon their actual loss.

That is especially the case when the Court does not have the ability to evaluate the economic circumstances on a time line of each innocent investor/victim from 2001 to 2009. For these reasons, the Court has concluded that a pro rata distribution is not only manageable, but, most importantly, is fair and equitable since the Court declines to evaluate the economic circumstances of each investor from beginning to end.

The Court remains hopeful that in the best interests of all of the victims, that the efforts of the United States to maximize liquidation of assets for forfeitures will substantially reduce the loss for all victims even if they have no substantial likelihood of recovering all of their out-of-pocket losses, which is all too familiar in most Ponzi schemes and fraud schemes that come before the United States District Courts of this country.

## CONCLUSION

Based on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Bruce Hendry's motion to implement a "Percentage Equalization Method of Distribution" restitution plan is respectfully **DENIED**.

2. Restitution shall be distributed on a pro rata basis.


Dated: September 30, 2011          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge